**UNITED STATES of America, Appellant,**

v.

**Javier Aristizabal LONDONO, Defendant,**

**Diego Lopez–Aguilar, Defendant–Appellee.**

**No. 546, Docket 95–1332.**

United States Court of Appeals, Second Circuit.

Argued Nov. 27, 1995.

Decided Jan. 5, 1996.

Amended Nov. 14, 1996.

Before: ALTIMARI and JACOBS, Circuit Judges, and CONNER,* District Judge.

The mandate is recalled to consider the impact, if any, of the defendant's deportation prior to argument of the original appeal; upon recall of the mandate, we reinstate the erroneous sentence, remand for correction of the sentence pursuant to Fed.R.Crim.P. 35(a)(1), and vacate the portion of the district court's order of July 16, 1996 that directs the clerk to remove the case from the active calendar.

* The Honorable William C. Conner, United States District Judge for the Southern District of New

JACOBS, Circuit Judge:

On January 5, 1996, we issued our opinion in this appeal, holding that the district court (Weinstein, *J.*) erred in downwardly departing from the statutory minimum sentence by reason of extraordinary family circumstances. At that time, this Court was unaware that the defendant had been deported after serving his sentence, pursuant to the order and direction of the district court that he would be voluntarily or involuntarily deported to Colombia immediately following his incarceration. *See United States v. Lopez–Aguilar*, 886 F.Supp. 305, 306 (E.D.N.Y. 1995).

That circumstance has set in motion a train of events on remand. Hearings have been conducted on how and whether notice of the deportation was conveyed to this Court, and whether this Court had an opportunity to consider the possible effects of the deportation on the appeal. The district court has ruled both that our mandate cannot be enforced because defendant's absence makes resentencing impossible, and that, as a result of our having vacated the erroneous sentence, there is and can be no conviction.

We hereby recall the mandate to address the issue of potential mootness, a jurisdictional question that should have been timely presented by disclosure of the deportation, but that we had no opportunity to consider and address. *See United States v. Salameh*, 84 F.3d 47, 50 (2d Cir.1996) (Court of Appeals "always has authority to restore appellate jurisdiction over a case that has been remanded to a district court"); *Sargent v. Columbia Forest Prods., Inc.*, 75 F.3d 86, 89 (2d Cir.1996) ("Our power to recall a mandate is unquestioned."). For reasons stated, we conclude that this appeal was not moot. Having recalled the mandate, we recast it in order to reinstate the district court's erroneous sentence until such time as the error can be corrected. And we remand to a different district judge for reasons stated in this opinion.

York, sitting by designation.

## BACKGROUND

Defendant was sentenced on May 18, 1995. The district court declined to impose the mandatory minimum ten-year sentence on the ground that the fertility problems of the defendant and his wife constituted extraordinary family circumstances justifying a downward departure—the ruling that we have held to be erroneous. *See United States v. Londono,* 76 F.3d 33 (2d Cir.1996). Familiarity with our January 5 opinion is assumed, but the essential findings are briefly stated.

The district court found that the defendant and his wife were suffering from infertility (although the defendant's wife was pregnant when he was arrested); that they "had made serious and concerted efforts to conceive a child" (although they were both arrested in the course of retrieving a drug cache, not ordinarily a recommended course of pre-natal care); and that the defendant's wife miscarried after she was deported to Colombia as an illegal alien (unsubstantiated medical news evidently supplied by her from abroad in aid of her husband's release). Although we were constrained to credit these findings, we held that family planning does not constitute an extraordinary circumstance, and overturned Judge Weinstein's decision to reduce the mandatory minimum sentence by more than two-thirds. *See Londono,* 76 F.3d at 37. To hold otherwise would permit all defendants of childbearing age to receive less than the minimum sentence prescribed. This matter seems to be a case study in the need for some form of sentencing guidelines.

At sentencing, the district court imposed a 37 month term of imprisonment and a five-year term of supervised release. However, the district court ordered *twice,* both in the order and in the judgment, that the defendant need not serve his supervised release in the United States, and that the INS must deport him to Colombia immediately following his incarceration. The government evidently did not notice that, with 825 days credit for time served in pre-conviction detention and 145 days of good time credit earned, the defendant would complete his jail sentence in October 1995 and be on his way abroad to join his wife (pursuant to the district court's order of deportation) before the government's appeal could be heard.

That is precisely what happened. The defendant completed his jail term on October 19, 1995, and was returned to Colombia on October 25, 1995. The appeal was argued on November 27, 1995, and we issued our opinion on January 5, 1996. We received no advice as to defendant's deportation.

The resentencing of the defendant was scheduled for March 6, 1996. At that hearing, Judge Weinstein ascertained that the defendant had been deported. He elicited confused and conflicting statements from counsel as to whether the Court of Appeals had been told of the deportation during argument, and observed:

> What I want to know is whether either deliberately or through maladroitness, the Court of Appeals was not informed of the nature of the situation which is now posed. As the matter now stands, in my opinion, subject to hearing … there has been no conviction of this defendant because a conviction takes place, as I understand the matter, at the time of sentence.
>
> So, we have a situation where there is no conviction of the defendant, and the defendant is in an enviable position because this matter is in the posture of the sentence having been set aside.

Defendant's counsel stated that he had had a conversation with the defendant "before he had been deported, and he was most concerned that the Court of Appeals argument date would not occur prior to the time that he was scheduled for deportation, and I said at that point, I said, Diego, I don't have an oral argument date as of yet…."

The Assistant United States Attorney advised the district court that, following oral argument in the Court of Appeals on November 27, 1995, defendant's counsel had informed him that the defendant had been deported. At the hearing, the AUSA produced a letter dated December 28, 1995, addressed to the three members of the appeals panel, which said that there had been "a recent development that raises a question of mootness," specifically that "after the oral argument, the parties learned that Lopez–

Aguilar had completed his sentence[,][ ] had been released by the Bureau of Prisons on October 19, 1995," and been deported to Colombia on October 25, 1995.

The AUSA then proposed that the court set a date for resentencing and require the defendant to appear, and that the government would "parole him in for the purpose of resentencing, which has happened in other cases." Later in the hearing, he renewed that proposal: "The government will obtain a parole for this individual to come back into the country. In the meantime, if he does not appear after the time that his parole is granted and before the time of the resentencing date, which could be two months from now, then our suggestion would be for the Court to issue a Bench Warrant for failure to appear."

The district court directed the filing of briefs, particularly as to whether, under the disentitlement doctrine, the government could seek resentencing of a felon who has been deported, and as to the duty of counsel to have "advise[d] the Court of Appeals with respect to the law respecting a pending appeal, seeking a ... resentence [when] as a practical matter, such resentence will never be possible." (The district court also directed defendant's counsel to get other counsel to substitute for him because he would be attending the next hearing as a witness.)

At the end of the March 6 hearing, the district court told the AUSA that, during the briefing period, "the Government can consider whether it can get permission to bring this man back and what you can do to induce him to come back. Perhaps it could do what it does in other instances, it could send its minions out to kidnap him."

The government filed a brief conceding that the defendant could not be resentenced in absentia, and emphasizing that the defendant agreed with the government that the deportation did not render the appeal moot. Further, the government's brief argued that the appeal was not subject to dismissal under the disentitlement doctrine, and that the government had had no obligation to call the attention of the appellate court to what the district court considered the possible applicability of the disentitlement doctrine.

The government also addressed the district court's suggestion at the March 6 hearing that the Second Circuit mandate voided Lopez–Aguilar's conviction (by vacating the sentence under circumstances in which a new sentence could not be imposed), and listed some contexts in which a vacated sentence might nevertheless have continuing impact.

Defendant's new counsel recognized in his brief that the disentitlement argument raised sua sponte by the district court would be unprecedented: "Neither I nor the government have yet found a case where it has even been argued." For that reason, according to defendant's brief, the parties had not entertained the concept of disentitlement when they agreed to advise the Court of Appeals that the appeal was not moot. Realizing that the defendant could not hope to prevail on the argument that the failure to argue disentitlement bespoke ineffectiveness of appellate counsel, defendant's new counsel instead urged the district court to dismiss the indictment on that ground, in which event the disentitlement issues could be expected to reach the Court of Appeals via a government appeal.

At the June 20 hearing, the district court heard testimony concerning both counsel's knowledge of the deportation, and their notification—if any—to the Court of Appeals. Defendant's counsel testified that he had received a call from the defendant "prior to the oral argument in which we discussed that at some point soon he may be going to Louisiana for deportation proceedings." The AUSA testified that, as he left the courthouse with defendant's counsel after oral argument before the Court of Appeals, defendant's counsel "indicated ... that I should check on the defendant's status because he was either advised that the defendant was going to be deported soon or was going into INS custody soon." "Within a week," the AUSA made calls to the Bureau of Prisons and then to the INS. "Within a short time thereafter," he "found the contact number for the INS facility where the defendant had been moved," and was told the defendant had been deported. Then, "I believe within three weeks of—between two and three weeks of

my finally deciphering that he had been actually deported, I wrote the letter to the Second Circuit."

Everyone at the hearing was aware of circumstances supporting the reasonable inference that the December 28 letter was never received by this Court or the panel members. Judge Weinstein stated: "My law clerk tells me that they don't seem to have a copy of this in the file." The AUSA responded in part: "[T]he letter was not docketed in the Second Circuit Court of Appeals. We've learned that they cannot locate the letter." He added that "[t]he clerk in the Second Circuit checked with the individual judges and no one could find a copy.... The location of the letter within the Second Circuit files hasn't been resolved."

The purpose of this June 20 hearing was to explore who knew what with respect to the defendant's deportation, and when. At the March 6, 1996 hearing, the district court had contemplated that either party might bring the resulting findings to the attention of the Court of Appeals; but at no time, in March or later in the course of the hearings and briefings, does it appear to have occurred to anyone to tell the panel what was in a letter that everyone can be reasonably assumed to have understood was never received by anyone at the Court of Appeals.

At the hearing, Judge Weinstein stated:

I'm in no position to follow the mandate of the Court of Appeals. The Court says: 'We vacate the sentence imposed by the District Court and remand for resentencing.' I cannot resentence.

The AUSA conceded that "[the error] was mine, Judge, because I did not check to see when the defendant's sentence was up.... I should have checked to see when the defendant's sentence was up and then moved for a stay either in the Court of Appeals or before your Honor of the defendant's release under applicable authority." The district court's final disposition consisted of leaving the case on the fugitive calendar and treating it "as a constructive fugitive case for purposes of calendaring," with the understanding (sought by defendant's counsel) that the fugitive designation would not redound to the defendant's "discredit ... [s]hould he return...."

Defendant's counsel moved to dismiss the indictment with prejudice on the ground that the government's act of deporting the defendant flouted the court's jurisdiction by making the judgment unenforceable. The district court denied that motion. To our knowledge, that ruling was not appealed.

At the June 20 hearing, Judge Weinstein observed: "I had planned to write in the case, but I think an opinion would really serve no purpose.... [A]n opinion would only embarrass the Court of Appeals, possibly, for not at least considering the issue, assuming the judges did get notice, which I do assume...."

The opinion of the district court, issued on June 28, 1996, and amended on July 16, 1996, opens with the recitation that "the United States Attorney *wrote* to the three members of the appellate panel notifying them" that the INS had deported the defendant prior to oral argument, and that "[t]he opinion and mandate of the court of appeals were issued after the letter had been *sent* to members of the panel notifying them of the fact that defendant was no longer in the United States." *United States v. Lopez–Aguilar*, No. CR 93–209, 1996 WL 407300, at *1 (E.D.N.Y. July 16, 1996) (emphasis added). In light of the extensive testimony before the district court that neither the Court of Appeals nor any member of the panel had become aware of such a letter, these findings make sense only if the issue were whether the letter was *sent*, rather than whether the letter was *received*. The clear implication that the letter was received (which is refuted by the record) can be read in tandem with Judge Weinstein's observation at the June 20 hearing that "[A]n opinion would only embarrass the Court of Appeals, ... assuming the judges did get notice...."

As to substance, the district court opinion holds that the deportation did not moot the appeal to this Court, but that the district court was "not in a position to follow the mandate." *Id.*, 1996 WL 407300, at *1. Relying on Fifth and Eleventh Circuit law, Judge Weinstein found that because the defendant's presence (which is said to be unobtainable) is constitutionally necessary for a resentencing

(as opposed to a sentence modification), the mandate of this Court unwisely vacated the sentence before remand. *See id.* (citing Fed. R.Crim.P. 43(a); *United States v. Tamayo,* 80 F.3d 1514 (11th Cir.1996); *United States v. Moree,* 928 F.2d 654 (5th Cir.1991); *United States v. Huff,* 512 F.2d 66 (5th Cir.1975)). Judge Weinstein offered his own prescription for appellate practice, which is to permit the sentence to stand unless modified in the defendant's presence. *Lopez–Aguilar,* 1996 WL 407300, at *3. There is also a section on disentitlement. Nowhere does the district court address the government's proposal at the March 6 hearing that the government obtain a parole for the defendant's reentry for the limited purpose of resentencing and incarceration.

## DISCUSSION

### A. *Mootness.*

Contrary to the district court's observations in its opinion, no notice or advice concerning the deportation was received in this Court by the Clerk or by any member of the panel. Notwithstanding the activity in the district court, no word of the deportation was received by the Clerk of this Court or the members of the panel until the district court issued its June 28, 1996 opinion.[1] After June 28, we asked the United States Attorney for information, and received for the first time a copy of a letter dated December 28, 1995, separately addressed to the chambers of each panel member, advising that the defendant had been deported prior to oral argument, and arguing that the appeal was nevertheless not moot. The United States Attorney has given assurance that the December 28 letter was sent from his office to each panel member and that, notwithstanding our non-receipt, the AUSA drafted,

signed and dispatched it, his supervisor edited it, his secretary specifically recalled the out-of-the-ordinary step of mailing three letters to three judges, and defendant's counsel (as also reflected on the record of the June 20 hearing) received a copy. Unknown circumstances apparently prevented the delivery of the letters, but we accept the assurances of counsel that they were sent.[2]

■ The misdirected letter of December 28 addresses the issue of mootness, and we have recalled the mandate to consider first of all this potentially jurisdictional question. We agree with the Government's argument that Lopez–Aguilar can be resentenced within the remaining period of the five year term of supervised release. *See United States v. Rico,* 902 F.2d 1065, 1068 (2d Cir.), *cert. denied,* 498 U.S. 943, 111 S.Ct. 352, 112 L.Ed.2d 316 (1990). *See also United States v. Brown,* 54 F.3d 234, 238 (5th Cir.1995) ("deportation does not extinguish supervised release"). Additionally, in light of the government's appeal, Lopez–Aguilar cannot be said to have formed an expectation of finality in the original sentence. *United States v. DiFrancesco,* 449 U.S. 117, 137, 101 S.Ct. 426, 437, 66 L.Ed.2d 328 (1980); *United States v. Gelb,* 944 F.2d 52, 58–59 (2d Cir. 1991). In *United States v. Valdez–Gonzalez,* the Ninth Circuit held that the deportation of the defendants did not moot the prosecution's appeal of a downward departure in sentencing. 957 F.2d 643, 647 (9th Cir.1992). Although the possibility was "speculative," the Ninth Circuit considered that they "could face further proceedings in this case upon reentering the country." *Id.; see also United States v. Villamonte–Marquez,* 462 U.S. 579, 581 n. 2, 103 S.Ct. 2573, 2575 n. 2, 77 L.Ed.2d 22 (1983) ("That respondents have been deported likewise does not remove the controversy involved.... [I]f respondents

---

**1.** The Office of the Clerk of the Court has no record or recollection of any inquiry concerning the December 28 letter.

**2.** The unreceived December 28 letter was sent one month after oral argument. Considering that the AUSA was told about the defendant's probable deportation by his adversary as they exited the courthouse after oral argument, and that the letter was not sent until two or three weeks after he confirmed the deportation, we think that the AUSA owed to the Court more

prompt inquiries and advice concerning a matter that he recognized involved potential mootness of an appeal that was sub judice. The pressure of other trials and commitments, cited by way of explanation rather than excuse (as the AUSA emphasizes), would justify a shorter letter, but not a delayed one. The proper procedure is to notify the panel by a letter to the Clerk of the Court, attaching copies addressed to the panel members.

manage to re-enter this country on their own they would be subject to arrest and imprisonment for these convictions."); *United States v. Campos–Serrano*, 404 U.S. 293, 294 n. 2, 92 S.Ct. 471, 472 n. 2, 30 L.Ed.2d 457 (1971) (appeal not mooted by deportation of defendant after reversal of conviction by Court of Appeals).

It may well be that the district court's sentence of supervised release was subverted by the order of immediate deportation, but it stands in the record nevertheless. The government might make some effort to retrieve the defendant; alternatively, the defendant, who was in this country illegally, might return. Moreover, collateral consequences alone will also support appellate jurisdiction over a sentencing issue that may no longer affect the jail time that the defendant may serve. *See United States v. Kassar*, 47 F.3d 562, 565 (2d Cir.1995) (considering challenge to upward departure after sentence served); *United States v. Fadayini*, 28 F.3d 1236, 1241 (D.C.Cir.1994) (defendant's sentencing appeal is not moot if there remains the possibility of "collateral legal consequences").

### B. *The Terms of the Mandate.*

■ Our original mandate vacated the sentence imposed by the district court and remanded for resentencing. *See Londono*, 76 F.3d at 37. In light of the deportation, the district judge pronounced his hands tied because our vacating of his erroneously-imposed sentence would require imposition of a new sentence (rather than a modification), something that the district judge held will require the presence of the defendant. Without expressing a view as to the district court's powers in the circumstances, or the effect of our original mandate, we think it best, having recalled the mandate, to obviate the issue. We therefore reinstate the erroneous sentence, *see United States v. Pipitone*, 67 F.3d 34, 39 (2d Cir.1995), remand for correction of the sentence pursuant to Fed. R.Crim.P. 35(a)(1), and vacate the portion of the district court's order of July 16, 1996 that

directs the clerk to remove the case from the active calendar.

In so doing we direct that further proceedings be assigned to a different judge. To reassign a case on remand, we need only find that "the facts might reasonably cause an objective observer to question [the judge's] impartiality," *Pescatore v. Pan American World Airways, Inc.*, 97 F.3d 1, 21 (2d Cir. 1996) (quotes omitted); *United States v. Microsoft Corp.*, 56 F.3d 1448, 1463 (D.C.Cir. 1995) (per curiam), or "[a]bsent proof of personal bias requiring recusation," that "reassignment is advisable to preserve the appearance of justice." *United States v. Robin*, 553 F.2d 8, 10 (2d Cir.1977)(in banc). *See also Rivas v. Brattesani*, 94 F.3d 802, 808 (2d Cir.1996); *Hispanics for Fair and Equitable Reapportionment v. Griffin*, 958 F.2d 24, 26 (2d Cir.1992). The district court's handling of this case has several troubling aspects: (1) The district court's original judgment provided that Lopez–Aguilar should be deported immediately following his period of incarceration, and imposed a sentence sufficiently long to avoid any immediate need to seek a stay of deportation. At the same time, the sentence was one that (absent a stay) would run out before the appeal could be heard. (2) The district court's June 28 opinion states that "[t]he parties refused the trial court's suggestion that they seek an amendment of the mandate," but we cannot find that recommendation in the record,[3] notwithstanding the implied holding of the district court's opinion that its hands were tied by our vacating of the sentence. (3) Although Judge Weinstein mentioned on the record his law clerk's report that the Second Circuit did not have the December 28 letter in the files, no one contacted any member of this panel, or the Clerk of the Second Circuit, to convey the news that the defendant had been deported. Instead, the district court issued an opinion implying without basis that this Court was aware of the deportation when it issued its January 5 opinion, a circumstance that the district court stated on the record would be "embarrassing" if true. In short, Judge Weinstein's handling of this case

---

**3.** *See* Transcript of March 6, 1996 hearing at 22 ("If either party wishes to ask the Court of Appeals to hold up its mandate or withdraw its

mandate pending a decision of this Court, you are authorized to make that application.").

makes an exorbitant claim on appellate resources.

Accordingly, we direct that further proceedings be assigned to a different judge, that the district judge assigned to this case upon remand consider whether or not the sentencing error can be corrected in the defendant's absence, as well as the prosecutor's proposal (made twice at the March 6 hearing, but apparently ignored by Judge Weinstein) that the government obtain parole for Lopez–Aguilar to return to the country for resentencing.

Finally, we note that Fed.R.Crim.P. 43(c) has been amended to provide that the defendant need not be present "when the proceeding involves a *correction* of sentence under *Rule 35* " (emphasis added).[4] Rule 35(a), in turn, discusses the "correction" of a sentence on remand:

> The court shall correct a sentence that is determined on appeal ... to have been imposed in violation of law, to have been imposed as a result of an incorrect application of the sentencing guidelines, or to be unreasonable, upon remand of the case to the court—
>
> > (1) for imposition of a sentence in accord with the findings of the court of appeals;
>
> *   *   *   *   *   *

Although our original mandate post-dated the amendment, Lopez–Aguilar was originally sentenced prior to the effective date of the Rule 43(c) amendment. The district court will wish to consider on remand the impact of this amendment, including its applicability in this sequence of events, but we express no view (having heard no arguments) as to what that impact may be, or as to the merits of other issues that may arise in the district court as a result of this remand.

---

**4.** The change is significant. Prior to December 1, 1995, Rule 43(c) provided that the defendant need not be present "at a *reduction* of sentence under Rule 35" (emphasis added).